IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

HD SALEM OR LANDLORD LLC,      )
                                     )
          Plaintiff,           )    TC-MD 120136N
                                     )
      v.                      )
                                     )
MARION COUNTY ASSESSOR,      )
                                     )
          Defendant.     )    **CORRECTED DECISION**

This Corrected Decision is issued to clarify the attribution of the court's real market value

conclusion to the land and improvements. The court finds that the improvements real market

value of property identified as Account R327905 was $28,225,860 for the 2011-12 tax year. The

2011-12 real market value conclusion of the Decision remains unchanged.

Plaintiff appeals the real market value of property identified as Account R327905

(subject property) for the 2011-12 tax year. A trial was held in the Tax Courtroom in Salem,

Oregon on August 7, 2012. James Poliyanskiy (Poliyanskiy), Oregon Certified General

Appraiser, appeared on behalf of Plaintiff. Brigit DuBois (DuBois), CMI, testified on behalf of

Plaintiff. Scott Norris, Assistant County Counsel, appeared on behalf of Defendant. Steven S.

Miner (Miner), Commercial Appraiser Supervisor, testified on behalf of Defendant. Plaintiff's

Exhibits 1 and 3, pages 1 through 78 were received without objection. Defendant's Exhibit A

was received without objection.

Defendant objected to Plaintiff's Exhibit 2 and page 79 of Exhibit 3,[1] an affidavit of

A. C. Boschen (Boschen) stating "[t]he total cost of construction" of the subject property "to the

best of [his] knowledge." Boschen was not available to testify at trial. Poliyanskiy stated that

---

[1] Plaintiff's Exhibit 2 and page 79 of Exhibit 3 are identical.

Boschen, the Director of Industrial Real Estate for Home Depot (the lessee), made that statement based on the subject property lease rate and based on disbursements to the developer, "IDI." (*See* Ptf's Ex 3-78.) Finding that no weight should be given to the affidavit of Boschen, the court excluded Plaintiff's Exhibits 2 and 3 at 79.

## I. STATEMENT OF FACTS

DuBois testified that the subject property is a "mega distribution center" and "rapid deployment center." The subject property is designed to "handle an estimated 250 trucks, 24 hours a day, every day." (Def's Ex A at 4 (emphasis removed).) The subject property improvement is "concrete tilt-up construction" with "466,200 square feet for the main segment as measured around the exterior, [and] 36 foot height at the eaves." (*Id.* at 25; Ptf's Ex 3 at 2, 59.) In addition to "450,073 square feet of storage," the subject property includes "16,127 square feet of office, * * * a 306 square foot attached fire equipment enclosure[, and] * * * an interior mezzanine of 44,942 square feet, plus extensive yard improvements." (Def's Ex A at 1.)

The subject property site is 52.6 acres located in the Mill Creek Corporate Center, a 650-acre mixed use development. (Ptf's Ex 3 at 2; Def's Ex A at 1, 3.) The Salem location of the subject property offers good access to Interstate 5 as well as Highway 22. (Ptf's Ex 3 at 3-4; Def's Ex A at 9-10.) Salem also offers access to railway and air freight. (*Id*.) DuBois testified that trucks deliver goods in bulk; the goods are pulled off of the trucks and quickly placed on a "pick system" before they are consolidated for shipment to stores through the Pacific Northwest region. Miner inspected the subject property on May 10, 2012. (Def's Ex A at 2.) He testified that trucks arrive at the subject property facility and park outside; inventory remains in trucks parked outside for some time before entering the facility. Miner testified that, because of that business model, the subject property includes more paved area than is typical of other industrial

sites: it includes "some 775,000 square feet of primarily heavy duty asphalt paving [and] 250,000 square [feet] of primarily heavy duty concrete paving[.]" (*Id.* at 5.)

Miner testified that, including the subject property, there are three mega warehouses in Marion County; the other two are located in Woodburn. (Def's Ex A at 10.) There are two mega warehouses located in Linn County. (*Id.*) Miner testified that, because mega warehouses are "regional," the market for such properties is very limited to a few potential tenants or buyers.

Plaintiff purchased the subject property land in December 2009 for $5,118,243. (Def's Ex A at 6.) Miner adjusted the purchase price of the subject property land upwards by $1,055,000 for "post-closing obligations regarding extension and improvement of infrastructure to the lot line, as recorded on the date of sale." (*Id.* at 21, 23.) He explained that the "actual cost for extending utilities and Depot Court was $1.1 million, of which half was reimbursed by the seller. Once the improvements to Kuebler Blvd. are completed, Home Depot will owe $505,000 to the seller[.] Thus, the actual improved site cost to Home Depot is understood to be the initial $5,118,243 plus $1,055,000 in post purchase obligations[.]" (*Id.* at 23.) DuBois testified that she disagrees with Miner's adjustment to the purchase price of the subject property land. She relied on the 2011-12 roll real market value of the subject property land, $5,499,010. (*See* Ptf's Compl at 3; Ptf's Ex 3 at 6.)[2] The subject property improvements were constructed in 2010. (Ptf's Ex 3 at 2.) DuBois testified that the actual cost to construct the subject property, as reported to her by Plaintiff, was $31,200,000, including land and financing fees. (*See* Ptf's Ex 3 at 6.) However, "detailed cost information" was not provided to Defendant or the court. (*See* Def's Ex A at 24.)

---

[2] The court notes a discrepancy in the Plaintiff's submissions. The roll real market value of the subject property land is identified in the complaint as $5,499,010. In Plaintiff's exhibit 3, the real market value of land is listed as $5,499,100. The court will use the value listed in Plaintiff's Complaint.

As additional evidence of the actual cost to construct the subject property improvements, DuBois provided a budget, dated December 9, 2009, that was prepared by IDI. (Ptf's Ex 3 at 75-77.) DuBois testified that total development cost under the original budget, not including financing, was $29,819,629. (*Id.* at 77.) She also provided a "Reconciliation," including "invoices" and "disbursements" from "8/26/2009" to "3/23/2011" that states "Total Paid to IDI of $23,762,944.16." (*Id.* at 78.) DuBois testified that the "disbursements" were from the owner, Plaintiff, to IDI. The "Total Project Cost," including land, is stated as $28,595,232.62, to which $92,632 for "[l]egal fees and change order reconciliation" and $2,512,135 for "[f]inancing and interest cost" are added for "[t]otal final construction cost" of $31,200,000. (*Id.*)

Miner stated: "A lease granted between [Plaintiff] and Home Depot USA, Inc. dated December 17, 2009 was provided by plaintiff's representatives. Because this date precedes project construction, it is strong evidence this is a built-to-suit facility." (Def's Ex A at 6.) Miner determined the subject property lease to be "atypical" due, in part, to the "length of [the lease] term," the lease rates, and the "lack of [an] escalator upon [] first renewal":

> "The lease is for 26 years commencing on [December 17, 2009,] with the tenant also having four five-year options to extend the lease. * * * This rent was initially set at $241,725 *per month* for the first 20 years, and $100 *per year* for the next six years, based on the then-estimated construction budget (not stated) and noting that this would be revised based upon the final budget. The first lease extension was to be at the base rent, 110% of base rent for the second extension, and fair market value rent for the third and fourth extensions."

(*Id.* at 6 (emphasis in original).)

DuBois did not determine the highest and best use of the subject property. Miner testified that the highest and best use is the "key" to the appraisal analysis. He determined that the highest and best use of the subject property as vacant was "industrial development, including distribution warehousing." (Def's Ex A at 16.) Miner reported that, as of January 1, 2011,

"speculative development of industrial space was non-existent in the greater Portland area." (*Id.*) Thus, "the only financially feasible form of development would have been owner-occupied or built-to-suit on behalf of a company with specialized needs that could not be met in the resale market." (*Id.*) Miner concluded that the highest and best use of the subject property as improved is "continued use as an owner-user or built-to-suit distribution warehouse facility."
(Def's Ex A at 17.)

DuBois presented evidence under the cost, sales comparison, and income approaches, but requests that the real market value be reduced to $31,200,000 based on the reported actual construction costs, including land and transaction costs. Miner relied only on the cost approach and concluded that the 2011-12 real market value of the subject property was $39,405,000, with $5,725,000 allocated to the land and $33,680,000 allocated to the improvements. The 2011-12 roll real market value of the subject property was $44,397,780, with $5,499,010 allocated to the land and $38,898,770 allocated to the improvements. (Ptf's Compl at 3.) The 2011-12 exception real market value of the subject property was $39,011,130 and the 2011-12 maximum assessed value was $40,422,290. (*Id.*) Plaintiff primarily disputes the 2011-12 improvements real market value and exception real market value.

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2011-12 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *3 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed

seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[3]

The assessment date for the 2011-12 tax year was January 1, 2011. ORS 308.007; ORS 308.210.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue[.]" ORS 308.205(2). There are three approaches of valuation that must be considered, although all three approaches may not be applicable: the cost approach, the sales comparison approach, and the income approach. OAR 150-308.205-(A)(2)(a); *Allen v. Dept of Rev.* (*Allen*), 17 OTR 248, 252 (2003). The real market value of property is ultimately a question of fact. *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citation omitted).

Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.     *Cost approach*

"The cost approach is 'particularly useful in valuing new or nearly new improvements.'" *Magno v. Dept. of Rev.* (*Magno*), 19 OTR 51, 55 (2006) (citation omitted). "The [cost] approach is especially persuasive when land value is well supported and the improvements are new or suffer only minor depreciation and, therefore, approximate the ideal improvement that is the

---

[3] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

highest and best use of the land as though vacant." Appraisal Institute, *The Appraisal of Real Estate* 382 (13th ed 2008) (*Appraisal of Real Estate*). "The principle of substitution is basic to the cost approach. This principle affirms that a knowledgeable buyer would pay no more for a property than the cost to acquire a similar site and construct improvements of equivalent desirability and utility without undue delay." *Id.* at 380; (*see also* Ptf's Ex 3 at 74). The cost approach is the most persuasive approach of value for the subject property as of January 1, 2011.

" 'In the cost approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation * * * in the structure from all causes.' " *Magno*, 19 OTR at 55 (citations omitted). DuBois did not separately analyze the land real market value of the subject property as of January 1, 2011; rather, she accepted the 2011-12 roll real market value of the land, $5,499,010. (*See* Ptf's Ex 3 at 6.)

Miner testified that he identified four comparable sales of land ranging in size from 27.22 to 77.9 acres that occurred between October 2008 and December 2010. (Def's Ex A at 20-23.) One of Miner's land sales was the subject property land sale for $5,118,243 in December 2009, which he adjusted upwards by $1,055,000 for "post-closing obligations regarding extension and improvement of infrastructure to the lot line, as recorded on the date of sale." (*Id.* at 21, 23.) Miner concluded adjusted land sale prices ranging from $2.27 to $2.69 per square foot and concluded $2.50 per square foot for the subject property, or $5,728,140. (*Id.*) Plaintiff objected to Miner's adjustment to the subject property land sale, but offered no evidence to rebut that adjustment or Miner's land value conclusion of $2.50 per square foot. Miner's land value conclusion of $2.50 per square foot is reasonable based on the evidence presented. No evidence

/ / /

was offered in rebuttal of Miner's land value conclusion. The court is persuaded that the 2011-12 real market value of the subject property land was $5,728,140.

1.    *Improvements: Reported actual costs and permit costs*

To determine the value of the subject property improvements, DuBois relied, in part, on the subject property actual costs, which she reported on her "Appeal Summary" as $25,700,900 for the improvements. (Ptf's Ex 3 at 6.) She also relied, in part, on the "Reconciliation" stating that the total amount paid to IDI was $23,762,944.16." (*Id.* at 78.) It is unclear to the court why those figures differ. Moreover, as Miner noted in his report and at trial, Plaintiff did not provide any cost information to support its reported actual cost. The "Reconciliation" identifying "disbursements" includes no information identifying the purpose for each disbursement and no information from which the court can discern whether the disbursements reflect the total and accurate cost of constructing the subject property improvements. (*Id.*) The court finds Plaintiff's reported actual cost to be unpersuasive evidence of the real market value of the subject property.

To determine the value of the subject property improvements, Miner relied in part on data from building permits issued for the subject property. (Def's Ex A at 24-25.) Using the subject property building permits, Miner determined an improvements cost of $33,974,922, not including "soft costs" or "entrepreneurial overhead." (*Id.* at 24.) Miner testified that he does not know how permit cost estimates are determined or what is included in each cost estimate. It is unclear how the permit value estimates were determined or whether they represent the total and accurate cost of constructing the subject property. The court finds the permit value estimates to be unpersuasive evidence of the real market value of the subject property.

/ / /

/ / /

2.      *Improvements: Marshall & Swift cost estimate*

DuBois and Miner each developed a cost estimate using Marshall & Swift. DuBois testified that she used the Marshall & Swift Valuation Service "Calculator Method."[4] (*See* Ptf's Ex 3 at 59-73.) Miner testified that he used the "Swift Estimator," a computerized version of the "Calculator," set "to the January 1, 2011 valuation date." (Def's Ex A at 25.) DuBois and Miner both agreed that the subject property is a "mega warehouse." (Ptf's Ex 3 at 65, 69; Def's Ex A at 25.) Neither DuBois nor Miner took a deduction for depreciation. (*See* Ptf's Ex 3 at 60; Def's Ex A at 26.) DuBois determined a "Total Indicated Replacement Cost" of $26,436,577, whereas Miner determined a "Replacement Cost New Estimate" of $33,681,646. (Ptf's Ex 3 at 59; Def's Ex 3 at 26.)

a.      *Quality class, base cost, and adjustments*

DuBois and Miner disagreed on the quality class of the subject property, which determines the "base cost" per square foot. (Ptf's Ex 3 at 59; Def's Ex A at 25.) Dubois testified that quality class is somewhat subjective; she used the class "C - 2.0," or "Average," which is $31.17 per square foot.[5] (Ptf's Ex 3 at 59, 69.) DuBois testified that the subject property fits the description of "average" with the exception of its "exposed insulation," which is a feature of the "low cost" class. (*See id.* at 69.) She testified that the "above average" category includes features that the subject property lacks; for example, it does not include "plaster or drywall" throughout the structure. (*See id.*)

---

[4] "The Calculator Method" uses "average square and cubic foot and square meter costs for various classes, occupancy types, and qualities of buildings together with modifiers for common deviations from the descriptions of the typical buildings listed." (Ptf's Ex 3 at 64.)

[5] DuBois provided an excerpt from the Marshall & Swift Calculator Method, stating that an "Average" mega-warehouse is characterized by the following: the "exterior walls" are "open steel or wood frame, block or tilt-up, good roof"; the "interior finish" is "painted walls, finished offices and break room, good flat slab"; the "lighting, plumbing and mechanical" is "adequate lighting, good plumbing fixtures, food service." (Ptf's Ex 3 at 69.)

Miner testified that he considered the subject property quality rating to be 2.5, which is "above average," noting that the office space is finished and has air conditioning. (Def's Ex A at 25.) He testified that the warehouse portion of the subject property is a quality class 2.0 or a bit above, but the offices and exterior detail bring the overall quality class to 2.5. (*Id.* at 6.) Miner testified that the subject property is "a notch above" the typical building of its type, as evidenced by photographs of the subject property. (Def's Ex A at 7-8.) He testified that the insulation is not fully exposed. Quality class 2.5 results in a base cost of $37.41 per square foot. (*Id.* at 25.)

DuBois and Miner agreed that the "base cost" does not include sprinklers. DuBois added sprinklers at $1.36 per square foot whereas Miner used $1.52 per square foot. (Ptf's Ex 3 at 59; Def's Ex A at 25.) The Marshall & Swift Calculator Method excerpt identifies the applicable cost range as $1.36 to $2.15 per square foot for sprinklers. (Ptf's Ex 3 at 70.) No explanation for the difference in sprinkler cost was provided, although both estimates appear to be supported.

DuBois testified that, after calculating the "unadjusted basic structure cost," she adjusted for the "perimeter" (85.0 percent); "wall height" (153 percent); "current cost" (103 percent); and location, or "local multiplier," (105 percent for Salem). (Ptf's Ex 3 at 59, 71-73.) She provided excerpts from Marshall & Swift supporting use of those multipliers in the "calculator method" as well as excerpts supporting the specific adjustments. (*Id.* at 64, 71-73.) DuBois determined a "Refined SQFT Cost" of $45.75 per square foot for a replacement cost of $21,330,116. (*Id.* at 59.) It is unclear whether Miner made similar adjustments to his base cost; however, he included a separate cost of $13.44 per square foot, or $6,263,397, for "exterior walls." (Def's Ex A at 25.)

The court finds Dubois's selection of the quality class 2.0 and base cost of $31.17 per square foot to be persuasive. (Ptf's Ex 3 at 59.) She provided excerpts from Marshall & Swift describing each quality class and supporting her selection of quality class 2.0, or "average," for

the subject property. (*Id.*)  Similarly, the court finds Dubois's adjustments for perimeter, wall height, current cost, and location to be persuasive.  She provided excerpts from Marshall & Swift supporting her method of adjusting the base cost as well as her specific adjustments.  As a result, the court accepts Dubois's adjusted base cost of $45.75 per square foot, or $21,330,116.  (*Id.*)

     b.  *Additional improvement costs not included in base cost*

   DuBois and Miner disagree with respect to the costs that are included in the "base cost" and the costs that should be separately added.  DuBois testified that Miner erred in adding costs for "heating and cooling" because those costs are included in the "base cost" and it is double-counting to add them separately.[6]  (Ptf's Ex 3 at 61, 69; Def's Ex A at 25.)  As support, she provided an excerpt from the January 2010 Marshall Valuation Service stating that both "good" and "average" mega-warehouses include "space heaters."  (Ptf's Ex 3 at 69.)  With respect to "Heating and Cooling," the Marshall Valuation Service Calculator Section states:  "If the heating found in the building being appraised is different from that indicated for the base being used, take the difference between the costs of the two and add to or subtract from the base square foot cost."  (*Id.* at 70.)  DuBois testified that the subject property heating does not differ from that included in the "base cost."  She testified, and Miner agreed, that the only part of the subject property that is air conditioned is the office.  Miner testified that he must enter figures for heating, cooling, and walls into the "Swift Estimator" or he will receive an error message.

   Miner identified the following items as not included in the base cost:

> "dock-high floors for all but the east wall and office portion of the south wall, adjustments of the HVAC system from the assumed type to the actual, elements of the docks not included in the base, the entrance porte cochere, the 44,942 square feet of steel mezzanine structure that supports the pick system, [] added attached fixtures such as the trash compactor and emergency generator[, and] * * * major yard improvements not included in Marshall & Swift base costs for

---

[6] Miner used $2.95 per square foot for "Heating & Cooling" for a total of $1,373,494.  (Def's Ex A at 25.)

this occupancy type, including paving, fencing and gates, yard lights, guard shack, and monument sign."

(Def's Ex A at 26.) Miner identified a specific unit and total cost for each additional item not included in base cost for a total additional cost of $4,329,539. (*See id.* at 25.) DuBois added $2,594,327 for "Other Imps Cost," but it is unclear what specific items were included in that cost. (Ptf's Ex 3 at 59.) Miner testified that DuBois missed the "dock-high floors" that are around most of the building, for which he added $1.30 per square foot or $507,910. (Def's Ex A at 25.)

The court is persuaded based on the Marshall & Swift excerpts provided by DuBois that the "base cost" includes heating and that no additional cost for "heating and cooling" should be included in the total improvement cost estimate. DuBois added "other" improvement costs of $2,594,327, but it is unclear which specific costs are included in that figure. (Ptf's Ex 3 at 59.) By contrast, Miner specifically identified additional improvement costs and the court accepts his total additional improvement costs of $4,329,539. (*See* Def's Ex A at 25.) The addition of Miner's additional improvement costs results in a total improvement cost, not including "soft costs," of $25,659,655.

### c.     *"Soft costs" and entrepreneurial profit*

*The Appraisal of Real Estate* distinguishes between "direct costs" and "indirect costs," stating that "indirect costs" include: "Architectural and engineering fees for plans, plan checks, surveys to establish building lines and grades, and environmental studies; Appraisal, consulting, accounting, and legal fees; The cost of carrying the investment in land and contract payments during construction; [and] All-risk insurance expense and ad valorem taxes during construction." *Id*. at 388. "Cost manuals rarely include all indirect costs or an allowance for entrepreneurial profit, so adjustments must often be made to obtain an indication of the total cost." *Id.* at 401.

"[A]n estimate of entrepreneurial profit or entrepreneurial incentive" is "a fundamental component of total cost[.]" *Id.* at 389. It is "a market-derived figure" and

> "most market areas have a typical or appropriate range of profit that can be determined through market research, usually through interviews with developers and other market participants about anticipated, acceptable, and actual levels of profit achieved in the market. The range of profit will vary for different types of structures and with the nature or scale of a given project. * * * Less risky, more standard competitive projects may merit a lower measure of profit."

*Id.*

DuBois testified that Miner erred in adding costs for "engineering, permits, and architectural fees," or "soft costs," because those are included in the base cost. (Ptf's Ex 3 at 61, 69; Def's Ex A at 25.) An excerpt from Marshall & Swift states: "In the Calculator Section, the actual costs used are final costs to the owner and will include average architects' and engineers' fees. These, in turn, include plans, plan check and nominal building permits, and surveying to establish building lines and grades." (Ptf's Ex 3 at 63.) Miner testified that he does not think that Marshall & Swift includes "soft costs and/or entrepreneurial overhead[.]" (Def's Ex A at 26.) He testified that those costs typically range from 10 to 20 percent of "hard costs"; he used 10 percent for the subject property, or $3,061,968. (*See id.*) Miner testified that he determined 10 percent for entrepreneurial profit based on his experience and his review of other deals. DuBois added "financing costs per taxpayer" of $2,512,134. (Ptf's Ex 3 at 59.)

DuBois presented persuasive evidence that the "base cost" includes "average architects' and engineers' fees" as well as "plans, plan check and nominal building permits, and surveying to establish building lines and grades." As a result, she did not make an addition for those costs, but did add $2,512,134 for "Financing Costs." (Ptf's Ex 3 at 59.) It is unclear what specific costs were included in that figure. Miner added a 10 percent cost for " 'soft costs' and /or entrepreneurial overhead[.]" (Def's Ex A at 26.) He determined 10 percent entrepreneurial

profit based on his review of other deals and "the size of the subject" property, both of which are appropriate considerations identified by *The Appraisal of Real Estate*. (*See id.*) The court finds that Miner's conclusion of 10 percent for indirect or "soft" costs, including entrepreneurial profit, is supported; 10 percent of the improvement cost, $25,659,655, is $2,565,966.[7]

The court finds that the total improvement cost of the subject property was $28,225,621. Adding the land value of $5,728,140, the court finds that the 2011-12 real market value of the subject property indicated by the cost approach is $33,953,761, or $33,954,000, rounded.

B.    *Sales comparison approach*

The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor,* TC-MD No 060354D, WL 1068455 at *3 (Apr 3, 2007) (citations omitted). The "court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson*, TC-MD No 020869D, WL 21263620 at *3. OAR 150-308.205-(D)(3)(c) states:

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length transactions. When non-typical market conditions of sale are involved in a transaction (duress, death, foreclosure, bankruptcy, liquidation, interrelated corporations or persons, etc.) the transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the non-typical market condition."

DuBois presented evidence of the 2011-12 real market value of the subject property using the sales comparison approach. Defendant criticized DuBois's reliance on the sales comparison approach, noting that she did not analyze the highest and best use of the subject property, which is critical to the selection of good comparable sales and leases. Miner testified that he rejected

---

[7] 10 percent of Miner's improvement cost estimate for "soft costs" was $3,061,968. (Def's Ex A at 25.)

the sales comparison approach because he could not identify any comparable sales in Salem or even Portland. (*See* Def's Ex A at 19.) He testified that the "supply and demand factors are unknown and most likely different" in the Puget Sound region. (*See id.*)

DuBois testified that she used CoStar to identify comparable sales; she searched flex and industrial properties over 300,000 square feet and built after 1995 that sold between January 1, 2009, and November 1, 2011. (*See* Ptf's Ex 3 at 17.) She testified that she had to expand her search to include both Oregon and Washington, noting that the subject property is a *regional* distribution center. DuBois's search yielded eight transactions, from which she selected four comparable sales and a "competitive region listing." (*Id.* at 7, 17-19.) She testified that she did not visit any of her comparable sales, except sale 3, located in Renton, Washington. DuBois testified that she did not identify any comparable sales in Salem that were greater than 300,000 square feet in size and none of her comparable sales were "built to suit" for a specific tenant.

DuBois's unadjusted sale prices ranged from $48.07 to $70.27 per square foot; the unadjusted listing price was $88.00 per square foot. (Ptf's Ex 3 at 7.) She made adjustments for sale date; conditions of sale; year built; and building class, type, size. (*Id.*) DuBois considered, but did not make, any adjustments for location and building condition. (*Id.*) She testified that she did not make any adjustments for size. DuBois determined adjusted prices ranging from $59.13 to $72.16 per square foot. (*Id.*) She selected $70.00 per square foot for the subject property, suggesting a 2011-12 real market value of $32,600,000, rounded. (*Id.*)

DuBois testified that the subject property was listed for $36,528,925 as of May 2011. (Ptf's Ex 3 at 3.) She testified that the listing price is based on the debt balance plus $6 million; as the debt balance decreases, the listing price will decrease. (*See id.* at 8.) DuBois testified that she determined the sale to asking price differential based on 12 sales between the fourth quarter

2008 and the fourth quarter 2010 of Oregon industrial properties over 100,000 square feet and built after 1995. (Ptf's Ex 3 at 15-16.) She testified that properties typically sold for about 10 percent less than the asking price as of January 1, 2011, and, based on the May 2011 listing, the likely selling price of the subject property would be $71.05 per square foot. (Ptf's Ex 3 at 7, 15-16.)

Defendant criticized Dubois's comparable sales, noting that most sales were inferior in quality to the subject property; some of her sales included multiple buildings; and some of her sales were not arm's-length transactions. Defendant noted that the subject property marketing flyer lists it as "Class A." (Ptf's Ex 3 at 8.) However, three of Dubois's four comparable sales are identified as "Class B"; sale 1 is identified as "Class A."[8] (*Id.* at 20, 24, 29, 35.) Dubois's comparable listing is a LEED Gold certified, Class A distribution warehouse in Fairview, Oregon; she testified that, as of January 1, 2011, it had been on the market for 275 days. (*Id.* at 7, 10-14.) She testified that the listing includes multiple buildings and is a multi-tenant property.

Dubois's sale 1, identified as "Class A warehouse," is the only comparable sale in Oregon; the property is located in Tualatin. (Ptf's Ex 3 at 7, 20-21.) Sale 1 occurred in October 2011 for $56.19 per square foot. (*Id.* at 7.) DuBois made upward adjustments for "conditions of sale" and for the year built, concluding an adjusted sale price of $64.06 per square foot. (*Id.*) The "Transaction Notes" state that the seller "needed to downside to a smaller space" and "[t]he buyer approached the seller with the opportunity to purchase the building outright." (*Id.* at 21.) DuBois testified that sale 1 does not appear to have been exposed to the market and likely included an element of distress. Miner testified that sale 1 included two buildings, one of which

/ / /

---

[8] In her sales comparison grid, DuBois lists both the subject property and all of her comparable sales as "MVS Const. Class-Type" as "C-Average"; the listing is "C-Good (LEED Gold)." (Ptf's Ex 3 at 7.)

is much older than the subject property. He testified that sale 1 has only about one-half the land to building ratio as the subject property, which is very important for the subject property.

Dubois's three other comparable sales were all located in Washington and appear to have been inferior in quality to the subject property. (Ptf's Ex 3 at 24, 29, 35.) Additionally, there is some question of whether any of those three sales were arm's-length transactions. Sale 2 is described as an "off-market transaction" and "[t]he motivation for the seller was to get rid of this property as it was not producing any income since it was completely vacant." (*Id.* at 25.) "The contact for the buyer [of sale 3] did report that they were going to have 100% rollover by the end of 2011 as both tenants have the[ir] leases end by the end of the year." (*Id.* at 30.) DuBois testified that the tenant rollover at the end of 2011 would "possibly" create some downward pressure on the price of sale 3. Sale 4 "was being marketed for lease, it was not actively marketed for sale. This was a direct deal. It was roughly 100 days from contract to close." (*Id.* at 36.) DuBois testified that the seller considered the listing for lease to be sufficient exposure to the market, even though the property was not exposed to the market for sale.

The Class A distribution warehouse in Fairview, Oregon listed at $88 per square foot as of January 1, 2011, is superior to the subject property and the listing price likely represents the upper end of the value range for the subject property. If the court accepts Dubois's adjustments, that listing indicates a real market value of $72.16 per square foot, or $33,640,992, for the subject property as of January 1, 2011. (Ptf's Ex 3 at 7.) For the reasons discussed above, Dubois's four comparable sales do not provide a reliable indication of the real market value of the subject property. "The sales comparison approach is most useful when a number of similar properties have recently been sold or a currently for sale in the subject property's market." *The Appraisal of Real Estate* at 141. Based on the evidence presented, there appear to have been

few, if any, arm's-length sales of comparable properties close to the January 1, 2011, valuation date. As a result, the court gives little weight to the sales comparison approach.

C.      *Income approach*

"Any property that generates income can be valued using the income capitalization approach." *Appraisal of Real Estate* at 447. "The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen*, 17 OTR at 253 (citations omitted).

DuBois testified that she completed a "pro-forma income approach" based on market rates. (Ptf's Ex 3 at 37.) Her lease comparables are triple net lease listings of properties located in Oregon and Washington ranging in size from 203,550 to 484,500 square feet. (Ptf's Ex 3 at 43-6.) The lease asking rates range from $4.32 to $5.04 per square foot. (*Id.*) DuBois testified that she used a very conservative lease rate of $6.00 per square foot per year and a vacancy rate of five percent, although the average market rent for Marion County for the first quarter of 2011 was $4.35 per square foot per year and the actual vacancy was 10 percent. (*Id.* at 37, 38, 50-52.) She testified that she selected a capitalization rate of eight percent, which was the "most aggressive" rate that she found in her research using Integra, Realty Resources, and CBRE Portland. (*Id.* at 37, 50, 52 (rates ranged from 8.00 to 9.70 percent).) DuBois testified that she relied on Portland capitalization rate studies because there are no Salem capitalization rate studies. She concluded an indicated value under the income approach of $31,560,000. (*Id.* at 37.)

DuBois testified that the subject property actual lease rate is $5.88 per square foot and she also completed a "leased fee income approach" based on that lease rate. (*See* Ptf's Ex 3 at 53, 54-58.) She testified that she used the subject property actual lease rate of $5.88 per square

foot, zero vacancy, three percent management expenses, and a capitalization rate of 8.10 percent. (*Id.* at 53.) That approach indicated a value of $32,840,000. (*Id.*)

Miner testified that he did not use the income approach because he determined that the highest and best use of the subject property was owner-occupied or "built-to-suit"; the subject property was not feasible as an investor-owned, income-producing property as of January 1, 2011, and he could not identify sufficient data for an income approach. (*See* Def's Ex A at 18-19.) Miner explained: "Owner-occupied facilities theoretically provide a return on investment. However, the requisite information is difficult or impossible to separate from the economics and value of the enterprise as a whole." (*Id.* at 18.) "Built-to-suit facilities leased to the intended occupant potentially offer income and expense data that is either verifiable or can be reasonably estimated. * * * However, as the only built-to-suit warehouse facility of this size range in the region, there is no way to know whether the lease represents 'market' or not.' Very likely it does not * * *'' as evidenced by the lack of "market exposure," the "[n]on-market lease terms," and the "on-going relationship" between the lessor and lessee. (*Id.*)

The court agrees with Miner that the income approach is unreliable in this case. The subject property is leased but, as discussed by Miner, many aspects of that lease suggest that it does not reflect the market: specifically, relationship between the lessor and lessee; the fact that the lease was executed prior to completion of the subject property; and the unusual terms of the lease. Miner's highest and best use analysis supports a finding that the subject property was constructed for a specific owner-user and not as an investment property. The market data presented by DuBois is not derived from the same market as the subject property and supports Miner's conclusion that the only "financially feasible" development of the subject property as of January 1, 2011, was as an "owner-occupied or built-to-suit [property] on behalf of a company

with specialized needs that could not be met in the resale market." (Def's Ex A at 16.)

### III. CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that the cost approach, indicating a value of $33,954,000, is the most persuasive evidence of the 2011-12 real market value of the subject property. The court finds that the 2011-12 real market value of the subject property was $33,954,000, of which $5,728,140 was attributable to the land and $28,225,860 to the improvements. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2011-12 real market value of property identified as Account R327905 was $33,954,000.

IT IS FURTHER DECIDED that the 2011-12 exception real market value shall be adjusted in accordance with the court's determination.

IT IS FURTHER DECIDED that the parties' requests for costs and disbursements are denied.

Dated this ____ day of November 2012.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Corrected Decision was signed by Magistrate Allison R. Boomer on November 2, 2012. The Court filed and entered this Corrected Decision on November 2, 2012.*